70 A.3d 559

IN RE PLAN FOR THE ABOLITION OF THE COUNCIL ON AF-
FORDABLE HOUSING AND PROVIDING FOR THE TRANSFER
OF THE FUNCTIONS, POWERS, AND DUTIES OF THE COUN-
CIL ON AFFORDABLE HOUSING TO THE DEPARTMENT OF
COMMUNITY AFFAIRS, REORGANIZATION PLAN 1–2011.

Argued January 28, 2013—Decided July 10, 2013.

446

*Robert T. Lougy,* Assistant Attorney General, argued the cause for appellants Governor Chris Christie and Department of Community Affairs (*Jeffrey S. Chiesa,* Attorney General of New Jersey; *Mr. Lougy* and *Geraldine Callahan,* Deputy Attorney General, on the briefs).

*Adam M. Gordon* argued the cause for respondent Fair Share Housing Center (*Kevin D. Walsh,* attorney; *Mr. Gordon* and *Mr. Walsh,* on the briefs).

*Jeffrey R. Surenian* argued the cause for amicus curiae New Jersey League of Municipalities (*Mr. Surenian,* attorney; *Mr. Surenian* and *Donna A. McBarron,* on the brief).

*Henry L. Kent–Smith* submitted a brief on behalf of amici curiae Housing and Community Development Network of New Jersey, Corporation for Supportive Housing, and Mercer Alliance to End Homelessness (*Fox Rothschild,* attorneys; *Mr. Kent–Smith* and *Abbey True Harris,* on the brief).

*Edward L. Lloyd* submitted a brief on behalf of amici curiae David Epstein, James Gilbert, David Moore, Benjamin Spinelli, John Weingart, and Betty Wilson (*Morningside Heights Legal Services and Environmental Law Clinic, Columbia University School of Law,* attorneys; *Mr. Lloyd* and *Susan J. Kraham,* on the brief).

Chief Justice RABNER delivered the opinion of the Court.

This case is about whether a Chief Executive has the authority to abolish independent agencies that were created by legislative action. The issue arises in the context of whether the Legislature delegated the power to abolish the Council on Affordable Housing (COAH or Council) to the Governor. That question turns on COAH's status, which the Legislature outlined at *N.J.S.A.* 52:27D–305, and the scope of the Executive Reorganization Act of 1969 (Reorganization Act or Act), *N.J.S.A.* 52:14C–1 to –11.

The Legislature created COAH to ensure that municipalities fulfill their constitutional obligation to provide affordable housing. Because COAH is an executive agency, the Constitution required the Legislature to place COAH "within" an Executive Branch department. *See N.J. Const.* art. V, § 4, ¶ 1. At the same time, the Legislature took steps to make COAH independent and insulate it from complete Executive control. To achieve that aim, the Legislature included a term of art in COAH's enabling legislation when it placed COAH "in, but not of," the Department of Community Affairs (DCA). *N.J.S.A.* 52:27D–305(a). That phrase has long been understood to signify an agency's independence, *see N.J. Tpk. Auth. v. Parsons*, 3 *N.J.* 235, 244, 69 *A.*2d 875 (1949), and the Legislature has used the designation to create dozens of independent offices.

In June 2011, the Governor issued a Reorganization Plan that abolished COAH and transferred its responsibilities to DCA. The Governor relied on the Reorganization Act. The Act, however, extends the Chief Executive's authority only to agencies that are "*of* the executive branch." *N.J.S.A.* 52:14C–3(a)(1) (emphasis added). Because COAH is "in, but *not of*," an Executive Branch department, *N.J.S.A.* 52:27D–305(a) (emphasis added), the plain language of the Reorganization Act does not encompass COAH. We therefore conclude that the Act does not authorize a Chief Executive to abolish an independent agency like COAH. As a result, we affirm the judgment of the Appellate Division in that regard.

We offer no opinion as to whether COAH's structure should be abolished, maintained as is, or modified. That is a policy decision left to the Governor and the Legislature and guided by the Constitution. This case instead is about the process that the two branches must follow if they decide to alter COAH.

■ That same process applies to possible changes to other independent entities. The precise language in the Reorganization Act does not authorize a Chief Executive to abolish them and replace their independent boards with a cabinet official who answers to the Chief Executive. Instead, to abolish or change the structure of independent agencies, both the legislative and executive branches must enact new laws that are passed by the Senate and Assembly and signed by the Governor.

We need not address the State's appeal of a separate Appellate Division order that granted Fair Share Housing Center's motion in aid of litigant's rights. The parties have advised us that, in light of recent developments, the appeal is now moot and should be dismissed. We ask the Clerk to enter an order to that effect.

I.

A.

■ The Legislature enacted the Fair Housing Act (FHA) in 1985, *L.* 1985, *c.* 222, in response to the Supreme Court's two *Mount Laurel* decisions, *see N.J.S.A.* 52:27D–302; *Hills Dev. Co. v. Twp. of Bernards,* 103 *N.J.* 1, 19, 510 *A.*2d 621 (1986). The decisions recognized a constitutional obligation on municipalities to "afford[ ] a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing." *S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mount Laurel,* 92 *N.J.* 158, 205, 456 *A.*2d 390 (1983) (*Mount Laurel II* ) (citing *S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mount Laurel,* 67 *N.J.* 151, 174, 336 *A.*2d 713 (1975) (*Mount Laurel I* )). The FHA, in turn, created COAH, *N.J.S.A.* 52:27D–305, and gave it rulemaking and adjudicatory powers to satisfy the

requirement to provide affordable housing. *Hills, supra,* 103 *N.J.* at 20, 510 *A.*2d 621.

The Legislature codified COAH as an independent agency and structured it in a precise way. COAH was placed "in, but not of, the Department of Community Affairs," *N.J.S.A.* 52:27D–305(a)— a term of art that is discussed later. The Council consists of twelve "members appointed by the Governor with the advice and consent of the Senate." *Ibid.* The members represent different perspectives related to affordable housing:

four shall be elected officials representing the interests of local government, at least one of whom shall be representative of an urban municipality having a population in excess of 40,000 persons and a population density in excess of 3,000 persons per square mile, at least one of whom shall be representative of a municipality having a population of 40,000 persons or less and a population density of 3,000 persons per square mile or less, and no more than one of whom may be a representative of the interests of county government; four shall represent the interests of households in need of low and moderate housing, one of whom shall represent the interests of the nonprofit builders of low and moderate income housing, and shall have an expertise in land use practices and housing issues, one of whom shall be the Commissioner of Community Affairs, ex officio, or his or her designee, who shall serve as chairperson, one of whom shall be the executive director of the agency, serving ex officio; and one of whom shall represent the interests of disabled persons and have expertise in construction accessible to disabled persons; one shall represent the interests of the for-profit builders of market rate homes, and shall have an expertise in land use practices and housing issues; and three shall represent the public interest.

[*Ibid.*]

No more than six of the twelve members can belong to the same political party. *Ibid.* They serve six-year terms with staggered initial appointments, *N.J.S.A.* 52:27D–305(b), and can be removed only for cause in a proceeding in Superior Court, *N.J.S.A.* 52:27D–305(e).

The FHA granted COAH "extremely broad" powers that we refer to only briefly. *Hills, supra,* 103 *N.J.* at 32, 510 *A.*2d 621. Within months after its formation, and "from time to time thereafter," the Council was to divide the State into housing regions and determine the need for low- and moderate-income housing for the State and each region. *N.J.S.A.* 52:27D–307(a), (b). COAH is also required to establish and regularly adjust criteria and guide-

lines for municipalities to determine their fair share of the region's need for affordable housing, consistent with the FHA's overall scheme. *N.J.S.A.* 52:27D–307(c). The agency determines whether a municipality's housing plan complies with COAH's rules and makes it realistically possible for the municipality to achieve its fair share of low- and moderate-income housing. *N.J.S.A.* 52:27D–314(a), (b). If there is an objection to a municipality's plan—specifically, to its "petition for substantive certification," *see N.J.S.A.* 52:27D–313 to –314—the Council first engages in mediation among the parties. *N.J.S.A.* 52:27D–315(b). If mediation fails, the dispute is transferred to an administrative law judge for an expedited hearing. *N.J.S.A.* 52:27D–315(c).

To implement the FHA, COAH is empowered to adopt procedural and substantive rules. *See N.J.S.A.* 52:27D–307(c), –307.5; *In re Six Month Extension of N.J.A.C. 5:91–1 et seq.,* 372 *N.J.Super.* 61, 73, 855 *A.2d* 582 (App.Div.2004), *certif. denied,* 182 *N.J.* 630, 868 *A.2d* 1033 (2005). The rules are subject to the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1 to –15. *See N.J.S.A.* 52:27D–307.5, –308. Absent "an imminent peril to the public health, safety, or welfare," the APA requires public notice and an opportunity for comment before the adoption of any rule. *See N.J.S.A.* 52:14B–4. The FHA also expressly states that COAH "shall give appropriate weight to ... public comment" in carrying out its duties. *N.J.S.A.* 52:27D–307.

B.

In February 2010, the Governor issued Executive Order No. 12, which created the Housing Opportunity Task Force. 42 *N.J.R.* 659(a) (Mar. 15, 2010). He directed the Task Force to review existing affordable housing laws and regulations, assess "the continued existence of COAH," and issue a report in ninety days. *Ibid.*[1]

---

[1] Paragraph five of Executive Order No. 12 also directed COAH to refrain from processing applications for substantive certification or implementing its Third

The Task Force issued its report on March 19, 2010. The report concluded that in "the 25 years since its creation, COAH has failed to recognize the significant changes in New Jersey in environmental awareness, transportation infrastructure, population trends and the economic climate." The Task Force determined that COAH was "irrevocably broken" and proposed a new model for affordable housing policy.

Around the same time, the Legislature also considered changes to affordable housing law. Senate Bill 1 was introduced on January 19, 2010, *see* S. 1, 214th Leg. (N.J. Jan. 19, 2010), and amended a number of times, *see, e.g.,* S. Comm. Substitute for S. Comm. Substitute for S. 1, 214th Leg. (N.J. June 3, 2010); S. Comm. Substitute for S. Comm. Substitute for S. 1 [First Reprint], 214th Leg. (N.J. Dec. 10, 2010). On January 10, 2011, the Legislature passed a revised version of the bill that abolished COAH and transferred its remaining powers to DCA. S. Comm. Substitute for S. Comm. Substitute for S. 1 [Third Reprint], 214th Leg. (N.J. Jan. 10, 2011).

The Governor conditionally vetoed the bill on January 25, 2011. *Governor's Conditional Veto to Senate Committee Substitute for Senate Committee Substitute for Senate Bill No. 1 [Third Reprint]* (Jan. 25, 2011). His veto message outlined specific objections to the final bill and requested that it be amended to return to the version that passed the Senate on June 10, 2010. The Governor explained that the earlier Senate bill "was the result of significant negotiation between the Legislature and the Governor's Office" and "met many of our objectives to end the ineffective and burdensome COAH system." On February 7, 2011, the bill was withdrawn from consideration in the Legislature. In the end, no matter how close the branches were, they could not agree on a

---

Round regulations for ninety days. 42 *N.J.R.* 659(a). The Fair Share Housing Center challenged that order. In response, the Appellate Division stayed paragraph five and accelerated the appeal. The challenge became moot when—after the Task Force completed its work—the Governor issued Executive Order No. 20, which rescinded Executive Order No. 12. 42 *N.J.R.* 752(a) (Apr. 19, 2010).

new affordable housing policy, so the FHA and COAH remained intact.

The Governor issued Reorganization Plan No. 001–2011 (Reorganization Plan or Plan) on June 29, 2011. 43 *N.J.R.* 1621(a) (Aug. 1, 2011). The Plan abolished COAH and the terms of office of all existing board members. *Ibid.* It transferred COAH's powers, functions, and duties to DCA and replaced the twelve-member Council with the DCA Commissioner. *Ibid.*

The Governor relied on the Reorganization Act to authorize this action. *Ibid.* (citing *N.J.S.A.* 52:14C–1 to –11). The stated purpose of the Plan was "to reduce the unnecessary complexity of affordable housing administration in New Jersey, lower the administrative costs associated with the present regulatory process, and streamline the development of new housing projects." *Ibid.* According to the Plan, the transfer would "produce significant costs savings" and allow for more effective management of the State's affordable housing obligations by DCA, "without the necessity of the multi-member Council and a separate full-time staff." *Ibid.* More generally, the Plan's purposes track the language of the Reorganization Act: to promote effective management and expeditious administration; to reduce expenditures and promote efficiency; to group and consolidate Executive agencies according to major purposes; and to eliminate duplication of efforts. *Ibid.*; *see also N.J.S.A.* 52:14C–2(a).

Consistent with the Reorganization Act, the Plan stated that it would become effective sixty days from the date of filing, June 29, 2011, unless the Legislature adopted a concurrent resolution disapproving the Plan. 43 *N.J.R.* 1621(a); *see also N.J.S.A.* 52:14C–7. The Legislature cancelled its June 30, 2011 session and did not meet during the sixty-day period. The Plan thus took effect in late August 2011.

## C.

The Fair Share Housing Center (FSHC or Center) challenged the Reorganization Plan in court. In a published opinion dated

March 8, 2012, the Appellate Division invalidated the Plan. *In re Plan for Abolition of Council on Affordable Hous.*, 424 *N.J.Super.* 410, 38 *A.*3d 620 (App.Div.2012) (*In re COAH* ).

Judge Carchman, writing for a unanimous panel, focused on the plain language of the Reorganization Act. The statute authorizes the Chief Executive to reorganize entities that are " '*of the executive branch.*' " *Id.* at 423, 38 *A.*3d 620 (quoting *N.J.S.A.* 52:14C–3(a)). The panel determined that the underscored language did not include "in but not of" agencies like COAH. *Ibid.* The phrase "in but not of," the panel noted, was a "common means of identifying those agencies that the Legislature intended to be independent and outside the scope of Executive control—including the Executive's reorganization power—while also abiding by the constitutional mandate allocating every agency, independent or otherwise, to an established department in the Executive Branch." *Id.* at 424, 38 *A.*3d 620. For support, the panel cited the enabling statutes of various independent agencies that are "in but not of" an Executive Branch department. *Id.* at 424–25, 38 *A.*3d 620. The Appellate Division also relied on *Parsons, supra,* 3 *N.J.* 235, 69 *A.*2d 875. *In re COAH, supra,* 424 *N.J.Super.* at 423–24, 38 *A.*3d 620.

In addition, the panel reviewed COAH's "carefully crafted statutory scheme" and concluded that the Reorganization Plan "sacrificed the goals of independence and continuity suggested by COAH's design." *Id.* at 425–26, 38 *A.*3d 620. "Without clear direction in the Reorganization Act that it should apply to independent agencies," the panel found that "there is no basis from which to infer that the Legislature intended to permit a governor to undo such a balanced representation scheme through a reorganization plan." *Id.* at 426, 38 *A.*3d 620.

The Appellate Division also noted that the "reorganization power implicates separation of powers concerns." *Ibid.* The panel recognized that this Court upheld the constitutionality of the Reorganization Act in *Brown v. Heymann,* 62 *N.J.* 1, 297 *A.*2d 572 (1972). But the Appellate Division noted that *Brown's* analysis

relied on the analogous federal Executive Reorganization Act, 5 *U.S.C.A.* §§ 901 to 912, a model for the New Jersey law which had been upheld in federal court. *In re COAH, supra,* 424 *N.J.Super.* at 431, 38 *A.*3d 620. When Congress amended the federal act in 1977, it addressed constitutional concerns raised after the decision in *Brown* by, among others, then-Assistant Attorney General Antonin Scalia and Professor Laurence Tribe. *Id.* at 433–36, 38 *A.*3d 620. The panel observed that in response to concerns about the constitutionality of the legislative veto and the delegation of authority to transfer independent agencies, Congress amended the act to prohibit " 'abolishing or transferring an ... independent regulatory agency.' " *Id.* at 436, 38 *A.*3d 620 (quoting 5 *U.S.C.A.* § 905(a)(1)).

In light of those constitutional concerns, the panel concluded that "[a] narrow interpretation of New Jersey's Reorganization Act is warranted here." *Id.* at 437, 38 *A.*3d 620. The panel explained that "an explicit legislative mandate" was required to authorize "the abolition of an independent agency." *Ibid.* Because an "in but not of" agency like COAH was not subject to the Reorganization Act, the court invalidated the Reorganization Plan. *Id.* at 438, 38 *A.*3d 620.

## D.

The Attorney General, on behalf of the Governor and DCA, petitioned this Court for certification. The State also moved in the Appellate Division for a stay pending a decision on the petition. The Appellate Division denied the motion, and the State then moved for a stay in this Court. We denied the motion for a stay but granted the petition for certification on June 26, 2012. 211 *N.J.* 274, 48 *A.*3d 355 (2012).

Three amicus groups are participating in this case. The Appellate Division previously granted leave to appear to the Housing and Community Development Network of New Jersey, the Corporation for Supportive Housing, and the Mercer Alliance to End Homelessness (collectively, Network), organizations that advocate

for housing for low-income households, the homeless, and individuals with special needs. We granted two other amicus motions: one from David Epstein, James Gilbert, David Moore, Benjamin Spinelli, John Weingart, and Betty Wilson (Six Agency Members), six individuals who formerly served as members of independent State agencies; and another from the New Jersey League of Municipalities.

## II.

The Attorney General, on behalf of the Governor and DCA (the State), argues that the plain language of the Reorganization Act grants the Chief Executive the authority to abolish COAH. The State points to Article V, Section 4, Paragraph 1 of the State Constitution, which requires every agency to be in a principal department. Because COAH is in but not of DCA, and DCA is part of the Executive Branch, the State argues that COAH "necessarily is part of the Executive Branch." As a result, the State contends, COAH fits within the "broad definition" of "agency" in the Reorganization Act, which covers entities "of the executive branch."

The State acknowledges that COAH's allocation "in but not of" an Executive Branch department grants it a measure of independence. But independence from departmental control does not remove an agency from the Executive Branch, according to the State. Independent agencies like COAH, the State submits, therefore still fall under the Reorganization Act.

The State argues that COAH's statutory scheme does not remove it from the Reorganization Act; the Act contains a number of exclusions but does not exempt "in but not of" agencies. Consistent with that reading, the State points to actions by previous Governors who used the Reorganization Act to transfer "in but not of" agencies from one principal department to another. According to the State, the Act does not distinguish between the transfer and abolition of an agency.

The State also maintains that the Act does not raise separation of powers concerns. The broad powers granted to the Governor, the State submits, are consistent with the framework of the 1947 Constitution, which created a strong Chief Executive to manage the Executive Branch and its agencies. The State also highlights differences between the State and federal reorganization acts. In particular, the State notes that federal agencies need not be in the Executive Branch. The State further argues that the Reorganization Plan did not "alter powers granted"; its "only change is that the Commissioner, rather than COAH, will be implementing" the FHA.

Fair Share Housing Center urges that the judgment of the Appellate Division be affirmed. With regard to the statute's scope, FSHC argues that the plain language of the Reorganization Act excludes "in but not of" agencies like COAH. The Center claims that the Reorganization Act explicitly reaches agencies "of the Executive Branch" but not those "in but not of" the Executive Branch. The latter formulation, FSHC argues, insulates independent agencies from gubernatorial control at the same time that it places them in the Executive Branch to comply with the Constitution. By contrast, FSHC highlights other statutes, like the APA and state ethics legislation, which specifically apply to agencies "in" the Executive Branch. Had the Legislature meant to cover "in but not of" agencies in the Reorganization Act, FSHC contends, the law would have said so directly.

For support, FSHC points to certain decisions the Framers made at the 1947 Constitutional Convention: removing the phrase "and control" from Article V, Section 4, Paragraph 2 of the State Constitution, thereby limiting the Governor's power over agencies to "supervision," 5 *Proceedings of the Constitutional Convention of 1947* 371–73; and placing the power of reorganization with the Legislature and not the Governor, 2 *Proceedings of the Constitutional Convention of 1947, supra,* at 1126.

FSHC also directly raises constitutional concerns. It maintains that if the Reorganization Act is construed to allow the Chief

Executive to abolish an independent agency, the law would violate the Presentment Clause, *N.J. Const.* art. V, § 1, ¶ 14, and breach the separation of powers doctrine. According to FSHC, the law could also be used to eliminate various other independent agencies without any affirmative action by the Legislature. FSHC also focuses on the text and history of the federal Executive Reorganization Act—the model for New Jersey's law—which excludes independent agencies from its scope.

In addition, FSHC disputes a number of points the State raises. FSHC argues that no prior reorganization plan has abolished an "in but not of" agency, and that the Reorganization Plan has materially changed substantive parts of the FHA.

The Network, a group of three advocacy organizations, argues that the Reorganization Plan upends COAH's balanced structure and prevents advocates for low- and moderate-income households from having a voice in affordable housing policy. Amici also argue that the Appellate Division correctly enjoined COAH staff from seeking to reclaim affordable housing funds.

Six Agency Members, all former members of independent State agencies, argue that under State law, the Chief Executive has extensive authority over independent State agencies but lacks the power to abolish them. Amici also maintain that the enabling statutes for various independent agencies carefully balance the interests of different stakeholders, and that neither those laws nor the Reorganization Act authorize the Governor to abolish such agencies.

The League of Municipalities submitted certain arguments relating to the motion to enforce litigant's rights.

At oral argument, the parties disagreed about a 1972 reorganization plan relating to the Public Employment Relations Commission (PERC). Afterward, we asked for supplemental briefing on the subject. The parties' dispute continues. The State contends that Governor Cahill's reorganization plan, 4 *N.J.R.* 161–62 (July 6, 1972), eliminated PERC's independence from departmental

control and placed it "under the supervision of an assistant commissioner in the Department of Labor and Industry." In response, FSHC submits that PERC was merely "assigned to" the assistant commissioner but remained independent of any supervision or control by the department.

### III.

■ The Constitution requires the Legislature to allocate all executive and administrative offices within no more than twenty principal departments of State government. *N.J. Const.* art. V, § 4, ¶ 1; *Dalton v. Kean,* 213 *N.J.Super.* 572, 575, 517 *A.*2d 1224 (App.Div.1986), *certif. denied,* 107 *N.J.* 110, 526 *A.*2d 181 (1987). As part of the Reorganization Act, the Legislature gave certain powers to the Governor to reorganize executive agencies. *See N.J.S.A.* 52:14C-1 to -11. "[T]he Governor's authority is limited to that delegated to him by the Legislature" in the Act. *Dalton, supra,* 213 *N.J.Super.* at 575, 517 *A.*2d 1224; *see also Brown, supra,* 62 *N.J.* at 5-11, 297 *A.*2d 572 (upholding delegation against constitutional challenge).

The Act directs the Governor to "examine the organization of all agencies" from time to time and "determine what changes" are needed "to accomplish the following purposes":

(1) To promote the better execution of the laws, the more effective management of the Executive branch and of its agencies and functions, and the expeditious administration of the public business;

(2) To reduce expenditures and promote economy to the fullest extent consistent with the efficient operation of the Executive;

(3) To increase the efficiency of the operations of the Executive to the fullest extent practicable;

(4) To group, co-ordinate, and consolidate agencies and functions of the Executive, as nearly as may be, according to major purposes;

(5) To reduce the number of agencies by consolidating those having similar functions under a single head, and to abolish such agencies or functions thereof as may not be necessary for the efficient conduct of the Executive; and

(6) To eliminate overlapping and duplication of effort.

[*N.J.S.A.* 52:14C-2(a).]

The Act speaks of the Governor's power to examine and reorganize "agencies." *See ibid.*; *N.J.S.A.* 52:14C–4. That term is carefully defined at *N.J.S.A.* 52:14C–3:

(a) "Agency" means—

(1) Any division, bureau, board, commission, agency, office, authority or institution *of* the executive branch created by law, whether or not it receives legislative appropriations, or parts thereof;

(2) Any office or officer in any agency, but does not include the State Auditor[.]
[ (Emphasis added).]

In other words, to be subject to the Reorganization Act, a particular office must be "of" the Executive Branch.

When applicable, the Act provides the Governor broad powers to accomplish its goals. Under the statute, the Governor shall prepare a reorganization plan when, after investigation, he or she finds that one or more of the following actions "is necessary to accomplish" the Act's purposes:

(1) The transfer of the whole or a part of an agency, or of the whole or part of the functions thereof, to the jurisdiction and control of another agency; or

(2) The abolition of all or a part of the functions of an agency; or

(3) The consolidation, merger, or co-ordination of the whole or a part of an agency, or of the whole or a part of the functions thereof, with the whole or a part of another agency or the functions thereof; or

(4) The consolidation, merger, or co-ordination of a part of an agency or the functions thereof with another part of the same agency or the functions thereof; or

(5) The authorization of an officer to delegate any of his functions; or

(6) The abolition of the whole or a part of an agency which agency or part does not have, or on the taking effect of the reorganization plan will not have, any functions[.]

[*N.J.S.A.* 52:14C–4(a).]

The Governor is required to deliver a reorganization plan to the Senate and General Assembly "on the same session day." *N.J.S.A.* 52:14C–4(b). The plan "shall take effect ... 60 calendar days after" its transmittal to both houses "unless, between the date of transmittal and the end of the 60–day period, the Legislature passes a concurrent resolution stating in substance that the Legislature does not favor the reorganization plan." *N.J.S.A.* 52:14C–7(a). If the plan is not disapproved in that way, it "shall have the force and effect of law." *N.J.S.A.* 52:14C–7(c).

The Act also limits the Governor's power in certain respects. The Governor cannot propose

(1) Creating a new principal department in the Executive branch, abolishing or transferring a principal department or all the functions thereof, or consolidating 2 or more principal departments or all the functions thereof;

(2) Continuing an agency beyond the period authorized by law for its existence or beyond the time when it would have terminated if the reorganization had not been made;

(3) Authorizing an agency to exercise a function which is not expressly authorized by law at the time the plan is transmitted to the Legislature; [or]

(4) Increasing the term of an office beyond that provided by law for the office. [*N.J.S.A.* 52:14C–6(a).]

■ Case law notes another important limitation of the Act: "the Governor is limited to rearranging what already exists. He is not empowered to decide what new or different authority should be vested in his branch of government." *Brown, supra,* 62 *N.J.* at 10, 297 *A.*2d 572.

The State Reorganization Act is patterned after the federal Executive Reorganization Act, 5 *U.S.C.A.* §§ 901 to 912. *See Brown, supra,* 62 *N.J.* at 6, 297 *A.*2d 572. That statute originally provided that the President's reorganization plan became law unless either house of Congress disapproved. *See ibid.* (citing former 5 *U.S.C.A.* § 906(a)). After questions were raised about the act's constitutionality, *see In re COAH, supra,* 424 *N.J.Super.* at 432–35, 38 *A.*3d 620 the federal law was changed. It now requires affirmative approval by both houses of Congress before a proposed reorganization can go into effect. *See* Reorganization Act Amendments of 1984, Pub.L. No. 98–614, § 3(a), 98 *Stat.* 3192, 3192 (1984) (codified at 5 *U.S.C.A.* § 906(a)). The New Jersey Reorganization Act has not been similarly amended.

The parties debate whether the Reorganization Act, as applied to this case, violates the State Constitution. We do not address those issues because we are able to resolve this case on statutory grounds. *See Comm. to Recall Menendez from Office of U.S. Senator v. Wells,* 204 *N.J.* 79, 95, 7 *A.*3d 720 (2010) ("[W]e strive to avoid reaching constitutional questions unless required to do so." (citations omitted)); *Randolph Town Ctr., L.P. v. Cnty. of Morris,*

186 *N.J.* 78, 80, 891 *A.*2d 1202 (2006) ("Courts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation." (citations omitted)).

## IV.

We consider next the concept of "in but not of" agencies in New Jersey State government. The phrase is hardly a colloquial expression; the language is precise, not random or accidental, and it is used with a particular meaning in mind: to denote an agency's independent status.

■ Use of the phrase "in but not of" accomplishes two goals. As noted earlier, the Constitution requires that all executive offices "shall be allocated by law among and *within* not more than twenty principal departments." *N.J. Const.* art. V, § 4, ¶ 1 (emphasis added). Each department, in turn, is "under the supervision of the Governor." *N.J. Const.* art. V, § 4, ¶ 2. Thus, when the Legislature creates an agency and places it "in" a department of the Executive Branch, the above constitutional requirement is met.

But the precise language has an additional element: some entities are "in" an executive department—to satisfy the Constitution—but are "not of" that department. Those additional words express an agency's independence. *See N.J. Exec. Comm'n on Ethical Standards v. Byrne,* 238 *N.J.Super.* 84, 86, 569 *A.*2d 264 (App.Div.1990) ("The 'in, but not of' formula sprang from the constitutional requirement that all executive functions be allocated among 20 principal departments and the competing need for agency independence." (citation omitted)).

This Court first discussed the concept of "in but not of" agencies in *Parsons, supra,* 3 *N.J.* at 238, 69 *A.*2d 875. *Parsons* considered whether the New Jersey Turnpike Authority Act (Authority Act) was constitutional. *Ibid.* The Authority Act created the Turnpike Authority "*in* the State Highway Department." *Ibid.* (emphasis added) (citation omitted). It was established as "a body corporate

and politic," with the power "to construct, maintain, repair and operate turnpike projects" and to finance those projects through bond measures. *Ibid.* (citation omitted).

The Court held, among other things, that the Authority Act did not violate the constitutional limit on the State's ability to create debts. *Id.* at 241–42, 69 *A.*2d 875 (citing *N.J. Const.* art. VIII, § 2, ¶ 3). The Court turned back a challenge on that ground because, under the Authority Act, the Turnpike Authority's debts were imputed only to the Authority, and the State was not liable for them. *Id.* at 242, 69 *A.*2d 875.

The Court also rejected a separate argument that the Turnpike Authority was the alter ego of the State because it was "in the State Highway Department." *Id.* at 243–44, 69 *A.*2d 875. As Chief Justice Vanderbilt explained just two years after the 1947 Constitutional Convention, that provision was "manifestly intended" to comply with Article V, Section 4, Paragraph 1 of the Constitution but did not give the Department or its Commissioner any control over the Turnpike Authority. *Id.* at 244, 69 *A.*2d 875. By contrast, "[t]he Turnpike Authority is *in but not of* the State Highway Department and that fact does not make it any the less an *independent entity,* as the language of the entire Act clearly demonstrates." *Ibid.* (emphasis added). Although the State suggests that the reasoning of *Parsons* is limited to public corporations, the Court's stand-alone discussion of the concept of an "in but not of" agency undermines that claim.

The Appellate Division likewise recognized the independence of "in but not of" agencies in *Byrne, supra,* 238 *N.J.Super.* 84, 569 *A.*2d 264. *Byrne* addressed whether, under the Conflicts of Interest Law, the State Treasurer could promulgate a code of ethics for the Board of Public Utilities (BPU) or designate a "principal officer" in BPU to do so. *Id.* at 89, 569 *A.*2d 264 (quoting *N.J.S.A.* 52:13D–23).

At the time, BPU was " 'in but not of' " the Department of the Treasury and also " 'independent of any supervision or control by the Department.' " *Ibid.* (quoting *N.J.S.A.* 52:18A–2.1). The court

found that this "duplicative language ... represents a double legislative guarantee of the agency's independence and a warning against departmental interference with its function." *Id.* at 90, 569 *A.*2d 264. As a result, the court held that the Treasurer could not impose a code of ethical standards on BPU employees, which would compromise the "essential independence" of the agency. *Id.* at 89, 569 *A.*2d 264.

Over the years, the Legislature has used different language to create independent agencies: allocating them "in but not of" an Executive Branch department; declaring them "independent of supervision or control" of a department; or both. Those approaches all achieve the same goals: they comply with the constitutional mandate that executive agencies be within a State department and simultaneously insulate the agency from complete Executive Branch control.

"In but not of" agencies can be found in various executive departments. Among other examples are the following: the Casino Control Commission, *N.J.S.A.* 5:12–50(a), Casino Reinvestment Development Authority, *N.J.S.A.* 5:12–153(a), and Board of Public Utilities, *N.J.S.A.* 48:2–1(a), all "in, but not of," the Department of the Treasury; the Hackensack Meadowlands Development Commission, "in, but not of," DCA, *N.J.S.A.* 13:17–5(a); the Natural Lands Trust, *N.J.S.A.* 13:1B–15.119, Water Supply Authority, *N.J.S.A.* 58:1B–4(a), and Environmental Infrastructure Trust, *N.J.S.A.* 58:11B–4(a), all "in but not of" the Department of Environmental Protection (DEP); and the New Jersey Historic Trust, *N.J.S.A.* 13:1B–15.111, and State Library, *N.J.S.A.* 18A:73–26, both "in but not of" the Department of State.

Other statutes declare agencies "independent of any supervision or control" of the department where they are located. They include the Election Law Enforcement Commission, *N.J.S.A.* 19:44A–5 (within Department of Law and Public Safety); the Office of the Public Defender, *N.J.S.A.* 2A:158A–3 (within Department of Treasury); and the Pinelands Commission, *N.J.S.A.*

13:18A–4(a), and Highlands Water Protection and Planning Council, *N.J.S.A.* 13:20–4 (both within DEP).

Finally, several agencies are both "in but not of" a principal department and "independent of any supervision or control by" that department—the "double legislative guarantee" of independence referred to in *Byrne, supra*, 238 *N.J.Super.* at 90, 569 *A.*2d 264. They include the Civil Service Commission, *N.J.S.A.* 11A:2–1 (in Department of Labor and Workforce Development); the Garden State Preservation Trust, *N.J.S.A.* 13:8C–4(a) (in Department of Treasury); the State Ethics Commission, *N.J.S.A.* 52:13D–21(a) (in Department of Law and Public Safety); the Office of the State Comptroller, *N.J.S.A.* 52:15C–2(a) (in Department of Treasury); and the Office of Information Technology, *N.J.S.A.* 52:18A–227(b) (in Department of Treasury).

By way of example, the enabling statute for the Civil Service Commission explains the relationship between the agency and the department:

There is established *in, but not of,* the Department of Labor and Workforce Development in the Executive Branch of State government the Civil Service Commission. For the purpose of complying with the provisions of Article V, Section IV, paragraph 1 of the New Jersey Constitution, the Civil Service Commission is allocated within the Department of Labor and Workforce Development, but, notwithstanding this allocation, the commission shall be *independent of any supervision or control* by the department or by any officer or employee thereof. [*N.J.S.A.* 11A:2–1 (emphasis added).]

Enabling statutes can set limits to an agency's independence. They can empower the Governor to appoint and remove an agency's members. *See, e.g., N.J.S.A.* 2A:158A–4 (giving Governor power to appoint Public Defender); *N.J.S.A.* 13:1B–15.120 (giving Governor power to appoint trustees of New Jersey Lands Trust from list of nominees provided by non-profit groups); *N.J.S.A.* 13:17–5(b)(2), (d) (giving Governor power to appoint and remove for cause members of Hackensack Meadowlands Development Commission); *N.J.S.A.* 13:18A–5(a)(1), (c) (giving Governor power to appoint and remove for cause seven of fifteen members of Pinelands Commission); *N.J.S.A.* 13:20–5(a), (c) (giving Governor power to appoint and remove for cause members of Highlands

Water Protection and Planning Council); *N.J.S.A.* 19:44A–5 (giving Governor power to appoint members of Election Law Enforcement Commission); *N.J.S.A.* 27:23–3(b) (giving Governor power to appoint and remove for cause members of New Jersey Turnpike Authority); *N.J.S.A.* 48:2–1(c) (giving Governor power to appoint members of BPU).

Often, principal department heads—who are appointed by and serve at the pleasure of the Governor, *N.J. Const.* art. V, § 4, ¶ 2—serve on independent agencies as ex officio members or designate representatives to serve. *See, e.g., N.J.S.A.* 13:1B–15.120 (naming State Treasurer and Commissioner of DEP "or their respective representatives" as members of New Jersey Natural Lands Trust); *N.J.S.A.* 13:8C–4(b) (naming Commissioner of DEP, Secretary of Agriculture, Secretary of State, and State Treasurer as members ex officio of Garden State Preservation Trust); *N.J.S.A.* 52:27D–305(a) (naming "Commissioner of Community Affairs, ex officio, or his or her designee" as chairperson of COAH).

Many statutes also give the Chief Executive the power to veto the minutes of independent agencies. *See, e.g., N.J.S.A.* 13:8C–4(i) (Garden State Preservation Trust); *N.J.S.A.* 13:18A–5(h) (Pinelands Commission); *N.J.S.A.* 13:20–5(j) (Highlands Water Protection and Planning Council); *N.J.S.A.* 58:11B–4(i) (Environmental Infrastructure Trust).

■ But independent agencies are nevertheless insulated from the full supervision and control of the Executive Branch. *See Byrne, supra,* 238 *N.J.Super.* at 89–90, 569 *A.*2d 264. The Chief Executive's power over them extends only as far as their enabling statutes permit. *See Dalton, supra,* 213 *N.J.Super.* at 575, 517 *A.*2d 1224.[2]

---

2 The Framers were also sensitive about gubernatorial control over independent agencies. The original draft of Article V, Section 4, Paragraph 2 gave the Governor "supervision *and control*" over principal departments. 5 *Proceedings of the Constitutional Convention of 1947, supra,* at 373 (emphasis added). That

## V.

 At the heart of this case is a question of statutory interpretation: whether an independent agency like COAH is subject to the Reorganization Act. Specifically, this appeal requires that we determine whether COAH, which is "in, *but not of*," the Department of Community Affairs, is covered by the Reorganization Act, which specifically applies only to agencies that are "of" the Executive Branch.

### A.

 To interpret the Reorganization Act, we apply well-settled rules of statutory construction. The Court's role is to determine and give meaning to the Legislature's intent. *See Headen v. Jersey City Bd. of Educ.*, 212 *N.J.* 437, 448, 55 *A.3d* 65 (2013). We start with the plain language of the statute, which is typically the best indicator of intent. *N.J. Dep't of Children & Families v. A.L.*, 213 *N.J.* 1, 20, 59 *A.3d* 576 (2013); *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.2d* 1039 (2005).

 In general, we give words their ordinary, generally accepted meaning. *N.J.S.A.* 1:1–1; *Headen, supra*, 212 *N.J.* at 451, 55 *A.3d* 65 (citations omitted). When the Legislature uses technical words and phrases that have "a special or accepted meaning in the law," we construe them "in accordance with such technical or special and accepted meaning." *N.J.S.A.* 1:1–1; *see also Marino v. Marino*, 200 *N.J.* 315, 329, 981 *A.2d* 855 (2009). Judges cannot

---

language led to discussion in the Committee on the Executive, Militia and Civil Officers about the extent of the Governor's authority over quasi-independent agencies like the Public Utilities Commission. *Id.* at 371, 529–30. One witness, a professor in the field of government, objected to the words "and control" because they suggested "that the Governor could issue orders to all of these departments," including quasi-independent entities. *Id.* at 373. He recommended that the clause be pared back to "supervision"—but not "control"—which would still empower the Governor to appoint and remove agency heads. *Ibid.* The draft was amended accordingly. *Id.* at 407; *see also N.J. Const.* art. V, § 4, ¶ 2 (limiting Governor's authority to "supervision").

substitute their own views for terms of art the Legislature has chosen.

If the language of a statute is clear, a court's task is complete. Courts may not rewrite a plainly written law or presume that the Legislature intended something other than what it expressed in plain words. *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039; *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002). Thus, the literal words of a statute, if clear, mark the starting and ending point of the analysis. Only if the statutory language is ambiguous do courts look beyond it to extrinsic evidence, such as legislative history, for guidance. *A.L., supra,* 213 *N.J.* at 20, 59 *A.*3d 576 (citing *Murray v. Plainfield Rescue Squad,* 210 *N.J.* 581, 592, 46 *A.*3d 1262 (2012)).

### B.

We turn, then, to the plain language of the statutes. COAH is "in" the Executive Branch—it is "*in,* but not of," DCA. *N.J.S.A.* 52:27D–305(a) (emphasis added). That formulation comports with the constitutional requirement that COAH be "within" a principal department of the Executive Branch. *See N.J. Const.* art. V, § 4, ¶ 1; *see also Byrne, supra,* 238 *N.J.Super.* at 86, 569 *A.*2d 264.

But COAH is not "of" the Executive Branch. The simple, direct words of the Fair Housing Act declare that COAH is *not of* the Executive Branch agency to which it is attached: again, COAH is "in, *but not of,*" DCA. *N.J.S.A.* 52:27D–305(a) (emphasis added).

The Reorganization Act uses equally precise language. Its reach extends to agencies that are "of" the Executive Branch, *N.J.S.A.* 52:14C–3—not to independent agencies that are simply "in" it. Because COAH is "in"—"but not of"—an Executive Branch department, it is not subject to the Act. The plain language the Legislature used in drafting the law compels that conclusion.

■ In construing a statute, we cannot infer that a branch of government has delegated its power to another branch on a major question without an express statement to that effect. *See Dalton, supra,* 213 *N.J.Super.* at 575, 517 *A.*2d 1224; *see also FDA v. Brown & Williamson Tobacco Corp.,* 529 *U.S.* 120, 159, 120 *S.Ct.* 1291, 1314, 146 *L.Ed.*2d 121, 150 (2000).[3] The Reorganization Act might have been written differently to apply to independent agencies that are "in but not of" the Executive Branch. But the Act was not drafted that way. The Legislature—which "we presume ... is familiar with laws it already has enacted," *Fair Share Hous. Ctr. v. N.J. State League of Municipalities,* 207 *N.J.* 489, 502, 25 *A.*3d 1063 (2011) (citation omitted), including its creation of many "in but not of" agencies—instead chose a different approach and did not include independent agencies in the scope or language of the Act. That choice is entitled to respect. We cannot override it and rewrite the plain words of the Reorganization Act. *See DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039; *O'Connell, supra,* 171 *N.J.* at 488, 795 *A.*2d 857.

Unlike the Reorganization Act of 1969, other statutes enacted around the same time include "in but not of" agencies within their reach. For example, the APA defines "agency" to include "each of the principal departments in the executive branch of the State Government, *and* all boards, divisions, commissions, agencies, departments, councils, authorities, offices or officers *within* any such departments." *L.* 1968, *c.* 410, § 2(a) (codified at *N.J.S.A.* 52:14B–2(a)) (emphasis added). Similarly, the Conflicts of Inter-

---

[3] The Framers decided to leave "the important power of reorganization of State departments and the allocation of existing departments among and within not more than 20 principal departments" to the Legislature. 2 *Proceedings of the Constitutional Convention of 1947, supra,* at 1126. The Committee on the Executive, Militia and Civil Officers believed that "the assignment of power to the Governor alone to reorganize the department would be inconsistent with an effective separation of powers of government among the three branches." *Ibid.* In 1969, the Reorganization Act delegated some, but not all, of that power to the Governor. *See Brown, supra,* 62 *N.J.* at 10, 297 *A.*2d 572; *Dalton, supra,* 213 *N.J.Super.* at 575, 517 *A.*2d 1224.

est Law defines "[s]tate agency" as "any of the principal departments in the Executive Branch of the State Government, *and* any division, board, bureau, office, commission or other instrumentality *within*" a principal department. *L.* 1971, *c.* 182, § 2(a) (codified at *N.J.S.A.* 52:13D–13(a)) (emphasis added).

When "'the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.'" *Higgins v. Pascack Valley Hosp.*, 158 *N.J.* 404, 419, 730 *A.*2d 327 (1999) (quoting *GE Solid State, Inc. v. Dir., Div. of Taxation*, 132 *N.J.* 298, 307–08, 625 *A.*2d 468 (1993)); *see also State v. Drury*, 190 *N.J.* 197, 215, 919 *A.*2d 813 (2007) (same).

Moreover, by 1985, when the Legislature adopted the Fair Housing Act, it was understood that the "in but not of" designation used to create COAH bestowed independence on an agency. *See Parsons, supra,* 3 *N.J.* at 244, 69 *A.*2d 875. We are required to give meaning to the term of art the Legislature selected. *See Marino, supra,* 200 *N.J.* at 329, 981 *A.*2d 855; *Pizzullo v. N.J. Mfrs. Ins. Co.*, 196 *N.J.* 251, 269, 952 *A.*2d 1077 (2008); 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* §§ 47:29, 47:30 (7th ed. 2007) (*Sutherland Statutory Construction* ).

The dissent would ignore the Legislature's precise language and substitute its own interpretation for what the Legislature meant. The dissent's focus on the word "of" overlooks the long history of "in but not of" agencies. To the dissent, the word "of" is cryptic and oblique and can be used interchangeably with other terms, *see post* at 480–81, 485 & n. 3, 70 *A.*3d at 581, 583 & n. 3, so the dissent supplies its own definition, *id.* at 480–81, 485, 70 *A.*3d at 581, 583. To the Legislature, which has often used the designation "in but not of" when drafting laws about State agencies, "in but not of" has a distinct meaning that is different from "of."

Words make a difference. In case after case, we note that it is the Court's responsibility to give force to the words the Legislature has chosen and not rewrite plainly written laws. *See, e.g.,*

*Headen, supra,* 212 *N.J.* at 448, 55 *A.*3d 65; *Murray, supra,* 210 *N.J.* at 592, 46 *A.*3d 1262; *Ryan v. Renny,* 203 *N.J.* 37, 54, 999 *A.*2d 427 (2010); *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039; *see also* 3A *Sutherland Statutory Construction, supra,* § 72:3 at 802 ("Courts read every word in a statute as if it was deliberately chosen...."). We must do the same here.

COAH's structure provides further proof that the existing law passed by the Legislature and signed by the Governor meant for COAH to be independent. The statute requires bipartisan control of the Council, with no more than six of its twelve members from the same political party. *N.J.S.A.* 52:27D–305(a). Although the Governor has the power to appoint the Council's members, the law narrowly circumscribes who may be appointed. *See ibid.* The membership requirements in the statute ensure that a cross-section of community and State interests serve on the Council, with individual members representing different voices: local government, households in need of low- and moderate-income housing, nonprofit builders of affordable housing, the disabled, for-profit builders, and the public interest. *Ibid.* Together, they comprise a balanced group with different perspectives.

Members serve staggered six-year terms that do not coincide with gubernatorial terms. *N.J.S.A.* 52:27D–305(b). For a member to be removed from the Council, the Attorney General must prove misconduct in office, willful neglect of duty, unfitness for office, or incompetence. *N.J.S.A.* 52:27D–305(e). The statute also places decisionmaking authority in the Council itself. *N.J.S.A.* 52:27D–307(c).

The law, thus, does not give the Chief Executive plenary power over the operation of the Council. The current statute reflects careful judgments about who should make decisions on affordable housing policy and how those decisions are to be reached. Nothing in this opinion prevents the legislative and executive branches from changing both the decisionmaking structure and approach for the agency responsible for affordable housing. To do so, they can enact new laws in a manner consistent with the Constitution

and prior case law; they just cannot proceed under the specific terms of the Reorganization Act. This decision does not endorse a single affordable housing policy or manner of implementation as the only effective way to proceed.

The COAH Board's detailed and precise balance, set out in the law, would not survive under the Reorganization Plan. *See In re COAH, supra*, 424 *N.J.Super.* at 426, 38 *A.*3d 620. The dissent claims that the Reorganization Plan preserves COAH's functions under the FHA. *See post* at 491–93, 70 *A.*3d at 587–88. The Plan, though, changes the decisionmakers and replaces an independent COAH Board with a cabinet official who reports to the Governor. Other independent agencies, with their own statutorily defined structures, might also be affected. FSHC and amici argue that a different reading of the Reorganization Act would allow the Chief Executive to abolish or take control of independent agencies like the Meadowlands Conservation Trust, *N.J.S.A.* 13:17–89, the Highlands Council, *N.J.S.A.* 13:20–4, the Pinelands Commission, *N.J.S.A.* 13:18A–4, the Natural Lands Trust, *N.J.S.A.* 13:1B–15.119, the Election Law Enforcement Commission, *N.J.S.A.* 19:44A–5, and the State Ethics Commission, *N.J.S.A.* 52:13D–21, among others. But the language of the Reorganization Act does not empower the Chief Executive to replace independent boards with a department head over whom he or she has full control.

The dissent also suggests that the reorganization of COAH "would have furthered legislative intent." *See post* at 493, 70 *A.*3d at 588. For support, the dissent points to legislation that was vetoed and withdrawn. But "legislative inaction is generally a poor basis for statutory interpretation," *In re State*, 114 *N.J.* 316, 327 n. 2, 554 *A.*2d 1309 (1989) (citing *Amerada Hess Corp. v. Dir., Div. of Taxation*, 107 *N.J.* 307, 526 *A.*2d 1029 (1987))—even when a law has been vetoed, *see ibid.*

The State presents a number of arguments in an effort to show that COAH is subject to the Reorganization Act. The State contends that even when an agency is placed "in but not of" a

principal department, it is still "of" the Executive Branch and thus covered by the Act. *See N.J.S.A.* 52:14C–3(a)(1). According to the State, the "in but not of" designation frees an agency from the direct control of the department in which it is located, but the Constitution still requires the agency to be "of" the Executive Branch.

A careful reading of the Constitution, though, reveals that it requires that all executive offices be allocated "among and *within*" the twenty principal departments. *N.J. Const.* art. V, § 4, ¶ 1 (emphasis added). That language has led to the "in but not of" formulation that appears countless times in state statutes and case law. *See Parsons, supra,* 3 *N.J.* at 244, 69 *A.*2d 875; *In re COAH, supra,* 424 *N.J.Super.* at 424, 38 *A.*3d 620; *Byrne, supra,* 238 *N.J.Super.* at 90, 569 *A.*2d 264. But the clause does not declare that offices must also be "of" as opposed to "in" the Executive Branch. The default position the State advances—that all agencies are necessarily "of" the Executive Branch—thus does not find support in the text of the Constitution.

Consistent with the Constitution, some independent entities are allocated within a department, independent of its control, and also established *"in* the Executive Branch." *See, e.g., N.J.S.A.* 2A:158A–3 (allocating independent Office of Public Defender "within" Department of Treasury and establishing it "in the Executive Branch"); *N.J.S.A.* 48:23–3 (allocating independent New Jersey Public Broadcasting Authority "within" Department of Treasury and establishing it "in the Executive Branch"); *N.J.S.A.* 52:15C–2(a) (allocating independent Office of State Comptroller "within" Department of Treasury and establishing it "in the Executive Branch").

Underlying the Legislature's approach is a practical reality: to insulate an office from a principal department head, but not from the Chief Executive to whom the agency head reports, *see N.J. Const.* art. V, § 4, ¶ 2, would accomplish little. The consequence in this appeal is that an agency designed to be independent of

DCA would in effect be run by its Commissioner. That outcome would be at odds with the Legislature's intent.

The Attorney General also argues that the Act has been used before to reorganize independent agencies within the Executive Branch. But in those examples, Governors transferred agencies intact to other parts of the government. When Governor Cahill reorganized the Department of Labor and Industry, for example, his reorganization plan expressly provided that PERC, an independent agency within the Department, would "remain in accordance with" its enabling statute. 4 *N.J.R.* 161(a) (July 6, 1972). When Governor Whitman moved the New Jersey Historic Trust, an "in but not of" entity within the Department of Environmental Protection, to the Department of State, she specified that it would be "continued" in accordance with its enabling statute. 30 *N.J.R.* 1351(a) (Apr. 20, 1998); *see also In re COAH, supra,* 424 *N.J.Super.* at 419 n. 3, 38 *A.*3d 620. Governor Whitman did likewise when she moved the Office of Administrative Law and the Office of the Public Defender, two "in but not of" agencies, to the Department of the Treasury. 30 *N.J.R.* 1351(a). And none of the several reorganization plans that have transferred or modified the BPU have abolished the agency. *See* 26 *N.J.R.* 2171(a) (June 6, 1994) (reorganization plan by Governor Whitman moving BPU from "in, but not of, the Department of Environmental Protection" to "in, but not of, the Department of Treasury"); 23 *N.J.R.* 1726(a) (June 3, 1991) (reorganization plan by Governor Florio moving BPU from "in but not of the Department of Treasury" to "in but not of the Department of Environmental Protection"); 10 *N.J.R.* 466(a) (Nov. 9, 1978) (reorganization plan by Governor Byrne maintaining part of BPU in Department of Energy). The Attorney General has cited no example of a Chief Executive relying on the Reorganization Act to abolish an independent agency.

The State mistakenly argues that Governor Cahill's 1972 reorganization plan "abolished PERC's status as an agency independent of departmental control." That did not happen. PERC was moved, but it retained its structure and independence. The

reorganization plan "assigned" PERC to an assistant labor commissioner and noted that it "shall remain in accordance with" its enabling statute. 4 *N.J.R.* 162. By contrast, the same plan, a few lines earlier, directed that the Board of Mediation "report" to the assistant commissioner. *Ibid.* The language that established PERC's independence remained unchanged. *Compare L.* 1968, *c.* 303, § 5(a), *with L.* 1973, *c.* 326, § 2 (codified at *N.J.S.A.* 34:13A–5.1). The dissent's contrary conclusion overlooks the specific language of Governor Cahill's Reorganization Plan.

The dissent insists that a statute enacted in 1973 sheds light on PERC's reorganization and the Legislature's response. *See post* at 489–90, 70 *A.*3d at 586 (citing *N.J.S.A.* 34:13A–6.1). The legislative history reveals otherwise. It demonstrates that the Legislature focused on the Board of Mediation, which had not previously been independent, *see L.* 1945, *c.* 32, § 1, not PERC, an independent entity that had been transferred intact. *See, e.g.,* Assemb. 262 (Sponsor's Statement), 195th Leg. at 3 (N.J. Nov. 12, 1973) ("It is the purpose of this bill to establish or clarify by legislation the independence and autonomy of the New Jersey State Board of Mediation and to ensure that the board will have the same degree of independence from supervision and control as exists for the Public Employment Relations Commission."); Press Release, Office of the Governor (Dec. 18, 1973) (noting that bill signed into law "clarif[ied] the independence and autonomy of the State Board of Mediation").

The dissent also points to the abolition of the Commission on Higher Education in support of its view of the broad scope of the Reorganization Act. *See* 43 *N.J.R.* 1625(a) (abolishing commission under Reorganization Act on June 29, 2011). The dissent notes that the Legislature has not disapproved of the abolition of this independent entity, *see N.J.S.A.* 18A:3B–13(d), under the Reorganization Act or for any other reason.

This example, as well, cannot inform our understanding of the Reorganization Act for a simple reason: reorganizations or transfers of the Commission on Higher Education, or any other bodies

created under the Higher Education Restructuring Act of 1994, are not subject to the Reorganization Act. *See N.J.S.A.* 18A:3B–36.

We offer no opinion on the propriety of the recent reorganization and draw no inference from the Legislature's silence. If anything, this example demonstrates that historic practices that went unchallenged do not create precedent. They do not answer the question presented for the first time in this case: whether the specific, plain language of the Reorganization Act covers independent agencies and allows them to be abolished. We find that it does not.

The State Agency Transfer Act, *N.J.S.A.* 52:14D–1 to –8, offers no insight into the question. The law outlines the mechanics of what occurs when an agency is lawfully transferred; it does not identify—either directly or inferentially—which agencies may be transferred under the Reorganization Act. The dissent argues otherwise, even though no party or amicus raises the Transfer Act in this litigation, and no case law interprets the act as the dissent does. *See post* at 485–87, 486–87 n. 5, 70 *A.*3d at 584, 584 n. 5. At best, the Transfer Act tells us what would happen if a new law transferred COAH or another agency, but the statute does not reveal whether the Reorganization Act applies to "in but not of" agencies.

## C.

The scope of the Reorganization Act is also informed by the Presentment Clause. *See N.J. Const.* art. V, § 1, ¶ 14(a). The Presentment Clause outlines a straightforward feature of our bicameral legislative process: a bill must pass both houses before being presented to the Governor for final action. A related provision in the Constitution, known as the Separation of Powers Clause, directs that no branch may exercise powers that belong to either of the other branches. *N.J. Const.* art. III, ¶ 1; *see also Gen. Assembly v. Byrne,* 90 *N.J.* 376, 382, 448 *A.*2d 438 (1982).

The Legislature understood those basic concepts when it drafted the Reorganization Act. It accordingly limited the Executive

Branch to "rearranging what already exists." *Brown, supra,* 62 *N.J.* at 10, 297 *A.*2d 572. It did not empower the Chief Executive to place "new or different authority . . . in his branch of government." *Ibid.* By acting in that fashion, the Legislature sought to avoid raising concerns under the separation of powers doctrine and the Presentment Clause. *Ibid.*

Congress examined constitutional separation of powers issues in the federal reorganization act when it reauthorized the act in 1977. The House Committee on Governmental Operations heard testimony from then-Assistant Attorney General Antonin Scalia and Harvard Law School Professor Laurence Tribe. H.R.Rep. No. 95–105, at 11–17 (1977), *reprinted in* 1977 *U.S.C.C.A.N.* 41, 51–56. AAG Scalia opined that a one-house veto of a reorganization plan violated the federal Presentment Clause. *Id.* at 12–13, 297 *A.*2d 572 (citing *U.S. Const.* art. I, § 7). Professor Tribe offered a related concern that the statute's broad delegation of authority to abolish or consolidate agencies could unconstitutionally usurp Congress's lawmaking role. *Id.* at 15–16, 297 *A.*2d 572. He recommended, among other changes, "specify[ing] that no reorganization plan . . . may transfer a function from an independent agency or commission to an agency or branch of an executive department." *Id.* at 16, 297 *A.*2d 572. Congress's 1977 bill adopted Professor Tribe's recommendation. *See* Reorganization Act of 1977, Pub.L. No. 95–17, § 2, 91 *Stat.* 29, 31–32 (1977) (codified at 5 *U.S.C.A.* § 905(a)).

In 1984, Congress amended the statute again to require that both Houses of Congress affirmatively approve a reorganization plan for it to become law. *See* Reorganization Act Amendments of 1984, *supra,* § 3(a), 98 *Stat.* at 3192 (codified at 5 *U.S.C.A.* § 906(a)). The new section replaced language that allowed a reorganization plan to go into effect unless one House passed a resolution disapproving the plan within sixty days. Reorganization Act of 1977, *supra,* § 2, 91 *Stat.* at 32.

To reiterate, we do not reach the constitutional issues the parties debate about the State Reorganization Act because we are

able to resolve this appeal on statutory grounds. *See supra* at 463–64, 70 *A.*3d at 570–71. We therefore have no reason to reassess *Brown* today. *Brown*, of course, upheld the constitutionality of the Reorganization Act in 1972. *Brown, supra*, 62 *N.J.* at 5, 297 *A.*2d 572. In its ruling, the Court noted that the Act was patterned after the federal Executive Reorganization Act, which federal trial courts had sustained on constitutional grounds in 1936 and 1937. *Ibid. Brown's* analysis relied on then-existing federal law; it did not anticipate or address the changes to federal law made years later in response to constitutional concerns.

*Brown* also did not address the issue presented in this case: whether the Reorganization Act covers independent agencies. The dissent, though, claims that because PERC was affected by the reorganization plan reviewed in the Court's decision, *"Brown* confirms that the Legislature conferred upon the Governor reorganization powers that reach 'in but not of' agencies." *Post* at 497, 70 *A.*3d at 591. Nowhere in *Brown* can that conclusion be found. The decision addresses certain constitutional challenges to the Act, *see Brown*, 62 *N.J.* at 5–11, 297 *A.*2d 572, whether the Act applies to a principal department of the Executive Branch, *id.* at 11–12, 297 *A.*2d 572, and whether the Act's procedural requirements were followed, *id.* at 12–18, 297 *A.*2d 572. The Court's ruling does not discuss the meaning of the term "agency" in the Reorganization Act or whether "in but not of" agencies are covered by the Act. In fact, the reorganization plan in question affected more than a dozen entities, *see* 4 *N.J.R.* 161–62, and the opinion does not even mention PERC, let alone its independent status.

Once again, it bears emphasis that *Brown* interpreted the Reorganization Act to empower the Chief Executive to "rearrang[e] what already exists" but not "to decide what new or different authority should be vested in" the Executive Branch. *Brown, supra*, 62 *N.J.* at 10, 297 *A.*2d 572. Many prior reorganization plans, which have gone unchallenged, abided by that limit. Here, however, the abolition of an independent agency, and the

transfer of its decisionmaking authority to an Executive Branch department,[4] falls outside that restriction and outside the scope of the Reorganization Act. The fact that some form of legislative veto exists in the Act does not cure that problem. If the legislative and executive branches seek to make substantive changes to the law, they have to proceed through the ordinary legislative process. *See N.J. Const.* art. V, § 1, ¶ 14.

## VI.

As Judge Carchman aptly noted,

[t]he issue in this case is not whether COAH should or should not be an active participant in developing and implementing policies for affordable housing in New Jersey. Recent events have demonstrated that both the Legislature and the Governor are committed to charting another course for the future of affordable housing in this State.

[*In re COAH, supra,* 424 *N.J.Super.* at 438, 38 *A.*3d 620.]

We do not attempt to chart that course in this opinion. Instead, we examine the process the law requires. The plain language of the Reorganization Act does not authorize the Chief Executive to abolish an independent agency like COAH. If the Governor and the Legislature wish to abolish COAH, they must take another path.

For the reasons set forth above, we modify and affirm the judgment of the Appellate Division.

Justice PATTERSON, dissenting.

Forty-four years ago, the Legislature altered the method by which the agencies of State government may be reformed. The Executive Reorganization Act of 1969 (the Reorganization Act or the Act), *N.J.S.A.* 52:14C–1 to –11, grants to both elected branches

---

[4] Those changes, FSHC argues, have led to substantive differences in COAH's operating procedures as well: DCA did not follow the APA to make interim changes to affordable housing rules; decisions were not made at public meetings or based on public information; and the Commissioner, not the Board, has the ultimate authority to make decisions.

of government—the Executive Branch and the Legislature itself—authority to transfer, consolidate, merge or coordinate agencies, or to abolish them entirely. *N.J.S.A.* 52:14C–2, –4, –7. The statute assigns to the Governor the responsibility to propose reorganization plans and to submit them to the Legislature. *N.J.S.A.* 52:14C–4. The Act reserves to the Legislature the authority to legislatively veto any such reorganization plan by concurrent resolution. *N.J.S.A.* 52:14C–7.

No fewer than six Governors and a succession of Legislatures have applied the Reorganization Act to agencies within the "in but not of" category that the majority now holds to be beyond the statute's reach. Indeed, in *Brown v. Heymann,* 62 *N.J.* 1, 10–11, 297 *A.*2d 572 (1972), this Court upheld the constitutionality of the Reorganization Act in the wake of the Act's application to an "in but not of" agency. The instant case is the first occasion in which this Court has invalidated a reorganization plan pursuant to the Act on the grounds that "in but not of" agencies are insulated from the Reorganization Act.

Had the Legislature found Reorganization Plan No. 001–2011 (Reorganization Plan) to exceed the parameters of the Reorganization Act, it could have blocked it by legislative veto, a power that it expressly reserved to itself in the Act. Alternatively, in the original enactment or by amendment, the Legislature could have limited the Reorganization Act as the majority does today. Had it elected to do so, the Legislature had the option to exclude the Council on Affordable Housing (COAH), or a broader group of agencies, from the Act's reach. The Legislature could have prohibited the Governor from submitting a reorganization plan affecting "in but not of" agencies. Had the Legislature concluded that previous Governors overreached when they submitted reorganization plans affecting "in but not of" agencies, it had the authority to execute a legislative veto, or amend the Reorganization Act to make its intent clear. Furthermore, had the Legislature found that a reorganization plan affecting COAH would contravene the agency's enabling statute, the Fair Housing Act

(FHA), *N.J.S.A.* 52:27D–301 to –329.4, it could have expressed its intent in the FHA's original text or a statutory amendment. In short, the Legislature would need nothing more than statutory language or the simple exercise of its legislative veto to bar this or any other reorganization plan from affecting COAH. Yet the Legislature has not taken a single one of these steps.

Nonetheless, the majority finds a clear mandate for its decision today in what it characterizes as plain and precise language. *Ante* at 467–69, 70 *A.*3d at 573–74. This language consists of neither a paragraph nor even a sentence of statutory text, but a single word—"of"—in the statutory definition of "agency," *N.J.S.A.* 52:14C–3. In my view, the word "of," one of the most common and generic words in our language, serves an unremarkable function in the definition: connecting the litany of entities to which the Act applies to the relevant branch of government, the Executive Branch. I cannot construe this amorphous word to state or intimate anything more. It is, to me, inconceivable that a Legislature, long experienced in placing clear parameters upon its statutes, would limit this important law by such cryptic use of the word "of."

The majority does not premise its holding on a finding that the Reorganization Act is unconstitutional. *Ante* at 476–78, 70 *A.*3d at 578–79. Nevertheless, it generally invokes the Presentment Clause, *N.J. Const.* art. V, § 1, ¶ 14(a), and the Separation of Powers Clause, *N.J. Const.* art. III, ¶ 1, to buttress its construction of the Reorganization Act. *Ante* at 476–78, 70 *A.*3d at 578–79. I respectfully disagree with the majority's suggestion that either constitutional principle is relevant to the statutory construction at the heart of today's decision. As this Court held in *Brown, supra,* 62 *N.J.* at 11–12, 297 *A.*2d 572, the Reorganization Act is constitutional, and its application here was consonant with the Presentment Clause and separation of powers principles upon which the majority relies.

Had the Legislature in *N.J.S.A.* 52:14C–3 included plain language barring executive reorganization of "in but not of" agencies,

or had it otherwise expressed its intent to exempt COAH from the statute's reach, I would concur with the majority's invalidation of the Reorganization Plan. The statutory language and the history of the Reorganization Act lead me to the opposite conclusion: that the Act was and is intended to authorize the abolition and reorganization of COAH and other agencies that are similarly treated by our laws. Accordingly, I would uphold the Reorganization Plan at issue, and I respectfully dissent.

## I.

The Reorganization Act does not confer upon the Governor the unilateral authority to reorganize agencies. Instead, it authorizes the Governor to prepare a reorganization plan and deliver it for legislative review. *N.J.S.A.* 52:14C-4. The Legislature has "60 days after such delivery" to scrutinize the plan. *Brown, supra,* 62 *N.J.* at 5, 297 *A.*2d 572; *accord N.J.S.A.* 52:14C-7(a). If the Legislature "passes a concurrent resolution stating in substance that [it] does not favor the reorganization plan," *N.J.S.A.* 52:14C-7(a), by a simple majority of the Senate and the Assembly, *Fitzgerald's Legislative Manual,* 416 (Skinder-Strauss Assocs. ed., 2012), the plan is disapproved and has no effect, *see N.J.S.A.* 52:14C-7(a); *Brown, supra,* 62 *N.J.* at 12, 297 *A.*2d 572. The Reorganization Act does not require the Legislature to explain or justify its disapproval of a Governor's proposal.

The Reorganization Act's legislative veto provision provides important context to the broad scope of the Act. If the Legislature concludes that a reorganization plan exceeds the Governor's authority under the Act, or deems it to contravene the enabling act of the affected agency, it may disapprove the plan. *See N.J.S.A.* 52:14C-7(a); *Brown, supra,* 62 *N.J.* at 12, 297 *A.*2d 572. Indeed, the Reorganization Plan before the Court expressly acknowledged the Legislature's power to disapprove it during the sixty-day window prescribed by the Act. 43 *N.J.R.* 1622 (June 29, 2011). Thus, the Legislature reserved to itself the authority to ensure that no reorganization plan that exceeds the parameters of the

Reorganization Act, or contravenes the purpose of the agency at issue, will survive. The Act provides for the best measure of legislative intent: the Legislature's own decision whether to permit a given plan to proceed.

The Legislature's expression of the Reorganization Act's purpose is also informative. The Act was intended "[t]o promote the better execution of the laws, the more effective management of the Executive branch and of its agencies and functions, and the expeditious administration of the public business[.]" *N.J.S.A.* 52:14C–2(a)(1). Recognizing the Executive Branch's expertise in the reorganization of government entities, the Legislature "declare[d] that the public interest demands the carrying out of the purposes of subsection (a) of this section and that the purposes may be accomplished in great measure by proceeding under this act, and can be accomplished more speedily thereby than by the enactment of specific legislation." *N.J.S.A.* 52:14C–2(b). The Act reflects a pivotal legislative determination: that permitting the Executive Branch to initiate plans of reorganization represented the most efficient means of restructuring government agencies. As Governor Richard J. Hughes noted when he signed the Act, it was intended to allow New Jersey governors " 'to undertake many needed reforms' " and " 'organize New Jersey's executive departments along functional and efficient lines.' " Press Release, Office of the Governor (Feb. 3, 1969). Further, the Legislature expressly included in the delegation of authority the power to abolish, as well as to reorganize, the agencies within the statute's reach. *N.J.S.A.* 52:14C–2(a)(5), –4(a)(2), –4(a)(6).[1]

---

[1] The legislative history of the Reorganization Act underscores the Legislature's intent to grant to the Governor broad authority to reorganize agencies of State government and does not offer the slightest suggestion that "in but not of" agencies were beyond its reach. In the original bill submitted to the Senate, Section 6 had limiting language regarding the Legislature's disapproval authority. *See L.* 1969, *c.* 203, § 6. That language was deleted and the statute as enacted only provided that "[a] reorganization plan may take effect as provided in section 7" of the Act. *Ibid.* Additionally, the Sponsor's Statement provides no indication that the Governor's authority to reorganize the structure of the

As this Court noted in *Brown, supra,* 62 *N.J.* at 10, 297 *A.*2d 572, "[i]t was for the Legislature to decide whether to delegate the power or to attempt itself to initiate plans of reorganization. . . . There being authority to delegate the legislative power, it does not rest with us to quarrel with the legislative decision to make the delegation." The Legislature thus designed a statutory scheme that, in its judgment, best serves the goal of efficient agency reform. That statutory scheme utilizes the expertise and resources of the Executive Branch to reorganize—and to abolish—agencies, while reserving to the Legislature the power to bar any reorganization plan in conflict with legislative intent.

## II.

In my view, had the Legislature intended to exclude "in but not of" agencies from the Reorganization Act, it would have addressed that issue in the statute's definitional section. With a list of exempted agencies or a simple phrase, such as "except for agencies whose enabling statutes identify them as 'in but not of' the Executive Branch," the Legislature could have limited the pivotal definition with clear language.[2] Indeed, the Legislature excluded only "the State Auditor" from the agencies subject to the Reorganization Act. *N.J.S.A.* 52:14C–3(a)(2). Plain language excluding "in but not of" agencies is nowhere to be found.

---

Executive Branch is limited, aside from the express limitations of the Act. *See L.* 1969, *c.* 203 (Sponsor's Statement). Moreover, then-Governor Hughes' statements regarding the Act fail to illustrate any intent to further limit the Governor's authority under the Act, aside from what was expressly prohibited by the Act. *See* Press Release, Office of the Governor, 30 (Feb. 3, 1969); Richard J. Hughes, *Seventh Annual Message to the Legislature,* 55 (Jan. 14, 1969). Finally, the legislative history accompanying the Act attaches three published articles discussing the Act, none of which provide any indication the Legislature intended to limit the Governor's authority under the Act. *See L.* 1969, *c.* 203.

2 As the majority notes, the concept of "in but not of" agencies was recognized by the Legislature in express statutory language as early as December 1949. *See N.J. Tpk. Auth. v. Parsons,* 3 *N.J.* 235, 244, 69 *A.*2d 875 (1949).

Instead, the majority relies upon the Legislature's choice of the word "of" in the definition of "agency" which includes "[a]ny division, bureau, board, commission, agency, office, authority or institution of the executive branch created by law." *N.J.S.A.* 52:14C–3(a)(1). To the majority, the word "of" carries enormous import: it is intended to inform the Executive Branch, the judiciary and the public that the Legislature intends to exempt a class of agencies from the Reorganization Act. *See ante* at 448, 70 *A.*3d at 561–62. To me, the word "of" in the Reorganization Act serves one of its many ordinary functions in the English language: it connects the enumerated litany of government entities to the Executive Branch, so that the reader understands that governmental entities outside the Executive Branch are beyond the statute's reach. I cannot share the majority's view that this routine application of the word "of" was intended by the Legislature to convey a deeper meaning. When it defined the scope of the Reorganization Act, the Legislature had no need to resort to such an oblique term.[3]

That conclusion is underscored by the language of a parallel component of the statutory scheme under review.[4] The Transfer

---

[3] The majority relies upon the appearance of the term "within" in the definition of "agency" in the Administrative Procedure Act, *N.J.S.A.* 52:14B–2(a), and in the definition of "State agency" in the Conflicts of Interest statute, *N.J.S.A.* 52:13D–13(a). In contrast to the definitions of "agency" in the Reorganization Act, *N.J.S.A.* 52:14C–3(a), and the State Agency Transfer Act (Transfer Act), *N.J.S.A.* 52:14D–2, the definitions set forth in *N.J.S.A.* 52:14B–2(a) and *N.J.S.A.* 52:13D–13(a) encompass the "principal departments" of the Executive Branch. Having provided that the principal departments were subject to these laws, the Legislature then included several categories of entities "within" those departments in the definition of "agency," *N.J.S.A.* 52:14B–2(a), and "State agency," *N.J.S.A.* 52:13D–13(a). In my view, the use of the term "within" in these two statutes, and the use of the term "of" in the Reorganization Act and the Transfer Act, represent their drafters' choices among interchangeable prepositions, and nothing more.

[4] It is a fundamental principle of statutory construction, routinely invoked in the absence of plain language, that the Legislature "is presumed to be 'thoroughly conversant with its own legislation.' " *State v. Grunow*, 102 *N.J.* 133, 144, 506

Act, *N.J.S.A.* 52:14D-1 to -8, governs the transfer of State agencies pursuant to a reorganization plan prepared in accordance with the Reorganization Act. The Transfer Act includes a definition of "agency" that is strikingly similar to that of *N.J.S.A.* 52:14C-3: " '[a]gency' means and includes any department, division, bureau, board, commission, agency, office, authority or institution of the executive branch of the State Government, whether or not it receives legislative appropriations, or parts thereof." *N.J.S.A.* 52:14D-2. As in the Reorganization Act, the Transfer Act uses "of" to connect the various components of government to the Executive Branch. *Ibid.*

Yet, any suggestion that the word "of" was intended to exclude "in but not of" agencies from the Transfer Act—as the majority finds was intended in the Reorganization Act—would contravene another provision of the Transfer Act. *See N.J.S.A.* 52:14D-3. That section confirms that the Transfer Act applies to all agencies of State government, providing that "[w]henever by law an agency of the State Government is transferred, the provisions of this act shall apply unless otherwise provided by the act effecting such transfer." *Ibid.* It simply does not make sense that the Legislature would use the word "of" to exclude "in but not of" agencies from the Reorganization Act, and use the same term in the same manner to include such agencies in a statute enacted less than two years later.[5]

---

A.2d 708 (1986) (quoting *Brewer v. Porch*, 53 *N.J.* 167, 174, 249 A.2d 388 (1969)). It is also " 'presumed to be familiar with its own enactments.' " *In re Petition for Referendum on Trenton Ordinance 09–02*, 201 *N.J.* 349, 359, 990 A.2d 1109 (2010) (quoting *State v. Federanko*, 26 *N.J.* 119, 129, 139 A.2d 30 (1958)).

[5] The majority claims that the Transfer Act "offers no insight into the question." *Ante* at 476, 70 *A.3d* at 578. I respectfully disagree. In the Transfer Act, which sequentially follows the Reorganization Act and was enacted less than two years after that Act, the Legislature used the word "of" in precisely the manner in which the term appears in the Reorganization Act. *See N.J.S.A.* 52:14D-2. Yet the Act undisputedly applies to "in but not of" agencies. Consequently, the

When it drafted the Reorganization Act, the Legislature had yet another opportunity to express the intent that "in but not of" agencies should be excluded from the statute. The Legislature carefully constrained the Governor's authority to develop and submit reorganization plans. *N.J.S.A.* 52:14C–6, entitled "Reorganization plan provisions prohibited," bars the application of the Act for four prohibited purposes. The Act cannot be invoked to create, abolish, transfer or consolidate principal departments, *N.J.S.A.* 52:14C–6(a)(1), to continue an agency beyond its statutorily-prescribed period, *N.J.S.A.* 52:14C–6(a)(2), to authorize an agency to exercise a function that is not expressly authorized by law, *N.J.S.A.* 52:14C–6(a)(3), or to increase the term of an office beyond that provided by law, *N.J.S.A.* 52:14C–6(a)(4). Had the Legislature intended to bar any application of the Reorganization Act to "in but not of" agencies, it could easily have added a fifth category of precluded applications to *N.J.S.A.* 52:14C–6. Yet it did not.

Under the rules that traditionally guide this Court's construction of statutes, the absence of a reference to "in but not of" agencies in the limiting provisions of the Reorganization Act should carry substantial weight. " '[W]here a general provision in a statute has certain limited exceptions, all doubts should be resolved in favor of the general provision rather than the exceptions.' " *Nini v. Mercer Cnty. Cmty. Coll.,* 202 *N.J.* 98, 109, 995 A.2d 1094 (2010) (alteration in original) (quoting *Prado v. State,* 186 *N.J.* 413, 426–27, 895 A.2d 1154 (2006)); *see also State v. Reed,* 34 *N.J.* 554, 558, 170 A.2d 419 (1961) ("[T]he general rule of construction [is] that enumerated exceptions in a statute indicate a legislative intent that the statute be applied to all cases not specifically excepted."). Here, the Legislature's determination not to include "in but not of" agencies in *N.J.S.A.* 52:14C–6's enumeration of exceptions to the Reorganization Act is not only signifi-

---

Transfer Act directly contravenes the majority's construction of that the word "of" in *N.J.S.A.* 52:14C–3 to exclude "in but not of" agencies from the statute.

cant, but would be dispositive under ordinary principles of statutory construction.

In short, my review of the Reorganization Act's language reveals no evidence that the Legislature intended to exclude "in but not of" agencies from the statute. In my view, the presence of the word "of" in the Act's definition of "agency" does not even remotely amount to a legislative limitation on the Act. I do not share the majority's view that plain language excluding "in but not of" agencies can be found in the statute before the Court.

## III.

The history of the Reorganization Act is as instructive as its terms. Nearly all of our State's recent Governors have abolished or reorganized "in but not of" agencies pursuant to the Act. The Legislature has never expressed the view that these Governors have exceeded their authority by applying the Act to this special class of agencies. None of these reorganization plans were legislatively vetoed, as *N.J.S.A.* 52:14C–7 permits. None of them prompted an amendment to the Reorganization Act to clarify what the majority now finds to be the Legislature's intent. None of them provoked commentary from either the Senate or the Assembly suggesting that the Governor had overstepped his or her bounds. Until today, no Executive Branch reorganization plan has been struck down on the grounds cited by the majority.

The first application of the Act to an "in but not of" entity occurred almost immediately after the Act was passed. On May 11, 1972, Governor William T. Cahill submitted a Reorganization Plan pertaining to the Department of Labor and Industry. 4 *N.J.R.* 161(a) (May 11, 1972). The Reorganization Plan provided:

> The *Division of Public Employment Relations* (Public Employment Relations Commission) shall remain in accordance with *N.J.S.A.* 34:13A as amended and be assigned to the Assistant Commissioner for Labor Relations and Work Place Standards.
>
> [*Id.* at 162.]

The Division of Public Employment Relations was considered an "in but not of" agency by virtue of its enabling legislation, the Employer–Employee Relations Act (EERA), *L.* 1968, *c.* 303, §§ 1, 5(a), 6(a).[6] As the FHA sets forth the composition of COAH, the EERA prescribed specific membership requirements and limited the Governor's authority over the agency. *See id.* § 6.

After the plan was submitted to the General Assembly and the Senate, the Legislature did not adopt a concurrent resolution disapproving the plan. *Brown, supra,* 62 *N.J.* at 13–14, 297 *A.*2d 572. Thus, the plan became effective on July 11, 1972, sixty days from its delivery to both houses. *See id.* at 13, 297 *A.*2d 572. After the sixty-day period ended, the Legislature attempted to disapprove the plan, but was unable to because the deadline had passed. *Ibid.* This Court rejected a constitutional challenge to the Reorganization Act and permitted the plan to take effect. *See id.* at 6–12, 297 *A.*2d 572. There is no indication in the legislative history or in *Brown* that the Legislature—or the parties who challenged the Reorganization Act's constitutionality before this Court—suggested that PERC's status as an "in but not of" agency somehow immunized it from Governor Cahill's Reorganization Plan. Rather, the challengers attacked the constitutionality of the Reorganization Act, contended that the Act only authorized the Governor to reorganize agencies not considered "principal departments," and questioned whether the procedural aspects of the Act had been followed. *Id.* at 5, 11–12, 297 *A.*2d 572.

In the end, the Legislature amended the EERA to nullify the aspect of Governor Cahill's May 11, 1972 Reorganization Plan with which it disagreed:

To the extent that the reorganization plan of the Department of Labor and Industry which was submitted to the Legislature on May 11, 1972 (effective July

---

[6] In its original form, PERC's enabling legislation, the EERA, provided that the Division of Public Employment Relations—in which PERC resided—was "allocated within the Department of Labor and Industry, ... but not withstanding said allocation, the office shall be independent of any supervision or control by the department or by any board or officer thereof." *L.* 1968, *c.* 303, § 5(a).

10, 1972) is inconsistent with, changes or alters the powers of either the New Jersey Public Employment Relations Commission in the Division of Public Employment Relations or the Board of Mediation in the Division of Private Employment Dispute Settlement as they existed prior to the effective date of said reorganization, such reorganization plan shall be to such extent superseded and inoperative. [*N.J.S.A.* 34:13A–6.1.]

This statutory amendment demonstrates the Legislature's authority to correct any error that it perceives in a Governor's reorganization plan. In my view, it further undermines the majority's construction of the Reorganization Act in this case. If, as the majority concludes, the Legislature had already excluded all "in but not of" agencies from the Reorganization Act's reach by virtue of the word "of" in *N.J.S.A.* 52:14C–3(a), *N.J.S.A.* 34:13A–6.1 would be meaningless. In that event, there would have been no need for the Legislature to amend PERC's enabling statute to exclude PERC from Governor Cahill's Reorganization Plan. If the majority is correct, the legislative response to Governor Cahill's 1972 reorganization was peculiar indeed.

Governor Cahill's effort to reform PERC, and transfer its functions to a principal department of the Executive Branch, was only the first in a series of gubernatorial reorganizations, pursuant to *N.J.S.A.* 52:14C–4, that applied the Act to significantly alter "in but not of" agencies.[7] The Board of Public Utilities (BPU), considered an "in but not of" agency, created pursuant to *N.J.S.A.* 48:2–1 and allocated "in but not of" the Department of Treasury pursuant to *N.J.S.A.* 52:18A–2.1, has been the subject of reorganization plans submitted to the Legislature by three Governors. The first of these actions was taken on November 9, 1978, when pursuant to *N.J.S.A.* 52:14C–1 to –11, Governor Brendan T. Byrne submitted a Reorganization Plan that transferred some of BPU's functions to a principal Executive department, the Department of

---

[7] The majority asserts that there is a material distinction between transferring and abolishing an "in but not of" agency for purposes of the Reorganization Act. *Ante* at 473–75, 70 A.3d at 576–77. In fact, the Reorganization Act treats the abolition of a government agency and its transfer in precisely the same way: it authorizes both actions by a Governor as part of a reorganization plan submitted to the Legislature. *N.J.S.A.* 52:14C–4.

Transportation. 10 *N.J.R.* 466(a) (Sept. 18, 1978). On April 25, 1991, Governor James J. Florio transferred powers vested in BPU for solid waste to the Commissioner of the Department of Environmental Protection (DEP). 23 *N.J.R.* 1726(a) (Apr. 25, 1991). In a Reorganization Plan submitted on May 5, 1994, Governor Christine Todd Whitman transferred powers previously vested in the DEP to BPU. 26 *N.J.R.* 2171(a) (May 5, 1994). Although all three of these applications of the Reorganization Act to the BPU exceeded the Governor's authority under the Act as construed by the majority today, not one of them prompted the Legislature to undertake a legislative veto or a statutory correction.

The Reorganization Act has been invoked to transfer yet more "in but not of" agencies—generating no legislative veto or other expression of disapproval from the Legislature. On March 30, 1998, Governor Whitman moved the New Jersey Historic Trust, an "in by not of" agency previously in the DEP, *L.* 1995, *c.* 217, § 1, to the Department of State, 30 *N.J.R.* 1351(a) (Mar. 30, 1998). Governor Whitman similarly transferred two "in but not of" agencies previously situated in the Department of the State—the Office of Administrative Law and the Office of the Public Defender—to the Department of Treasury. 30 *N.J.R.* 1351(a). Again, notwithstanding the "in but not of" status of the affected agencies, the Legislature took no action to block these reforms.

Most recently, on the same day that he filed the Reorganization Plan at issue here, Governor Chris Christie submitted a second Reorganization Plan, 43 *N.J.R.* 1625(a) (June 29, 2011). That plan "abolish[ed] the New Jersey Commission on Higher Education" and "transfer[red] the powers, functions, and duties of the Commission to the Secretary of Higher Education." *Id.* at 1625. The Higher Education Restructuring Act of 1994 (HERA), *N.J.S.A.* 18A:3B–1 to –36, had created the New Jersey Commission on Higher Education, and provided that the commission "be established in the Executive Branch of the State Government." *N.J.S.A.* 18A:3B–13(a), (d). HERA further provided that "the commission is allocated in but not of the Department of State, but

notwithstanding this allocation, the commission shall be independent of any supervision or control by the department or by any board or officer thereof." *N.J.S.A.* 18A:13B–13(d). In the two years since Governor Christie's submission of the Reorganization Plan abolishing the Commission on Higher Education, the Legislature has not disapproved it on the grounds that it abolishes an "in but not of" agency in violation of the Reorganization Act, or for any other reason.

The majority distinguishes all but the last of these reorganizations of "in but not of" agencies on the ground that they were accompanied by language that preserved their functions pursuant to their enabling statutes. *Ante* at 473–75, 70 *A.*3d at 576–77. By its express terms, the Reorganization Plan at issue here does precisely that—it preserves COAH's functions and references its powers and obligations under the FHA. The plan provides:

> All of the powers, functions, and duties exercised by [COAH], including, but not limited to, those powers, functions, and duties granted pursuant to [the FHA] ... are continued, transferred to, and vested in the Commissioner of the Department [of Community Affairs]. ...
>
> [43 *N.J.R.* 1621.]

Thus, the language cited by the majority does not distinguish these "in but not of" agencies from COAH.

Six Governors have thus applied the Reorganization Act to "in but not of" agencies. On only one of those occasions—Governor Cahill's action with respect to PERC—did the Legislature invoke its authority to reverse the Governor's Reorganization Plan. *N.J.S.A.* 34:13A–6.1. Even then, the Legislature did not premise its objection upon the agency's "in but not of" status, but undertook a statutory amendment specific to PERC. *Ibid.* In the forty-four-year history of the Reorganization Act, the Legislature has never stated or implied that the Act does not reach "in but not of" agencies. Accordingly, I respectfully disagree with the majority's interpretation of legislative intent.

## IV.

In support of its decision striking down the Reorganization Plan, the majority relies in part on the structure of COAH as

prescribed in the current version of the FHA. *Ante* at 470–72, 70 *A*.3d at 575–76. On the one hand, the majority acknowledges that the legislative and executive branches have the authority to change the "decisionmaking structure and approach for the agency responsible for affordable housing." *Ante* at 471, 70 *A*.3d at 575. It confirms that it "does not endorse a single affordable housing policy or manner of implementation as the only effective way to proceed." *Ante* at 472, 70 *A*.3d at 575.

On the other hand, the majority invokes the existing structure of COAH, as set forth in the FHA, as evidence that the Legislature's affordable housing policy would be thwarted by the Reorganization Plan. *Ante* at 470–72, 70 *A*.3d at 575–76. To the majority, the FHA "reflects careful judgments about who should make decisions on affordable housing policy and how those decisions are to be reached," and the COAH Board's "detailed and precise balance" would be lost if the Reorganization Plan were permitted to proceed. *Ante* at 471–72, 70 *A*.3d at 575–76. The majority considers the structure of COAH that set forth in the current version of the FHA to support its conclusion that the Reorganization Plan contravenes legislative intent. *Ante* at 471–72, 70 *A*.3d at 575–76.

I respectfully disagree. In my view, there is abundant evidence that the reorganization of COAH struck down by the majority would have furthered legislative intent. As the majority acknowledges, *ante* at 451–53, 70 *A*.3d at 563–64, more than a year before the Governor submitted the Reorganization Plan, the Legislature passed a statute that would have abolished COAH and transferred its powers to the Department of Community Affairs (DCA), S. Comm. Substitute for S. Comm. Substitute for S. 1 [Third Reprint], 214th Leg. (N.J. Jan. 10, 2011) [hereinafter S. Comm. Proposal]. The proposal noted the need for "a new approach that will result in the creation of a realistic opportunity for a variety and choice of housing for low- and moderate-income families in each municipality of the State, without wasting the limited re-

sources needed to fulfill government's many functions, including public safety, health care, education and environmental protection, ensuring the affordability of mass transit, protection of civil rights, promotion of economic growth, and job creation." S. Comm. Proposal at 2. The Governor conditionally vetoed the bill for reasons unrelated to the provisions that would have abolished COAH and transferred its authority to DCA. *Governor's Conditional Veto to Senate Committee Substitute for Senate Committee Substitute for Senate Bill No. 1 [Third Reprint]* (January 25, 2011).

It was only after these events that the Reorganization Plan was submitted to the Legislature. The Plan mirrored the Legislature's design for the abolition of COAH and the transfer of its powers to DCA, and required DCA to fulfill COAH's functions under the FHA. *See* S. Comm. Proposal at 3; 43 *N.J.R.* 1621(a). The Legislature's proposal provided that: "[COAH] established by the [FHA] is abolished, and all of its powers, functions, and duties that are not repealed herein are continued in the [DCA]." S. Comm. Proposal at 3. In short, the Governor's and Legislature's proposed structural reforms of COAH were identical.

Moreover, the FHA is devoid of language excluding COAH from the Reorganization Act. When it passed the FHA in 1985, and at all times since that date, the Legislature was aware that it could exclude an agency from the Reorganization Act in that agency's enabling statute. It is thoroughly conversant in statutory language used in enabling legislation to exempt government agencies from its legislation. *See, e.g., N.J.S.A.* 52:13H–14 (providing that the Council on Local Mandates "shall not be subject to the provisions of the 'Open Public Meetings Act, [*N.J.S.A.* 10:4–6]' "); *N.J.S.A.* 40:43–66.39 (providing that joint municipal consolidation study commissions "shall not be subject to the provisions of the 'Local Public Contracts Law,' [*N.J.S.A.* 40A:11–1]"). Indeed, as noted, for reasons other than its "in but not of" status, the Legislature had already amended PERC's enabling legislation to exclude PERC from the Reorganization Act. *N.J.S.A.* 34:13A–6.1. A simi-

lar provision could easily have been added to the FHA. *See Reed, supra,* 34 *N.J.* at 558, 170 *A.*2d 419 (explaining that "enumerated exceptions in a statute indicate a legislative intent that the statute be applied to all cases not specifically excepted"). Yet the Legislature did not include such language in either the original or the amended version of the FHA.

Accordingly, 1 do not share the majority's view that the FHA buttresses its decision striking down the Reorganization Plan at issue in this case. To me, the proposed amendment to the FHA and the Reorganization Plan reflect the elected branches' shared intent to effect comprehensive reform. To the extent the majority suggests that the Reorganization Plan is either antithetical to the Legislature's design for the administration of affordable housing policy, or that it somehow subverts the Legislature's intent as codified in the FHA, I respectfully disagree.

## V.

I also disagree with the majority's reliance upon constitutional principles. *See ante* at 476–79, 70 *A.*3d at 578–80. In *Brown, supra,* 62 *N.J.* at 5, 297 *A.*2d 572, this Court considered a challenge to the constitutionality of the Reorganization Act. There, in the wake of Governor Cahill's Reorganization Plan affecting PERC, the plaintiffs contended that *N.J.S.A.* 52:14C–1 to –11 violated both the Presentment Clause of the New Jersey Constitution, *N.J. Const.* art. V, § 1, ¶ 14(a), which prescribes that bills be presented to the Governor for his or her consideration, and principles of separation of powers, *N.J. Const.* art. III, ¶ 1. *Brown, supra,* 62 *N.J.* at 5, 297 *A.*2d 572. This Court rejected those arguments. *Id.* at 10–11, 297 *A.*2d 572. Writing for the Court, Chief Justice Weintraub rejected the plaintiffs' Presentment Clause challenge, holding that the Legislature could constitutionally delegate to the Executive the power to reorganize, subject to the disapproval by a concurrent resolution from both houses. *Id.* at 6–8, 297 *A.*2d 572. The Court further held that the Reorganization Act did not run afoul of separation of powers principles,

holding that "while the doctrine of separation of powers is designed to prevent a single branch from claiming or receiving inordinate power, there is no bar to cooperative action among the branches of government." *Id.* at 11, 297 *A.*2d 572. Chief Justice Weintraub wrote:

[T]he constitutionality of the statute does not turn upon whether a plan is wise or unwise in a judge's view. We cannot condemn the statute because mistakes might be made under its auspices. The responsibility for such policy decisions rests with the other branches of government, and this because of the very doctrine of separation of powers upon which plaintiffs rely.

[*Id.* at 10–11, 297 *A.*2d 572.]

The majority states that it premises its holding solely on statutory grounds and does not decide the constitutionality of the Reorganization Act as applied to "in but not of" agencies in general or COAH in particular. *See ante* at 448, 477–78, 70 *A.*3d at 561–62, 579. Nonetheless, the majority holds its construction of the Reorganization Act to exclude "in but not of" agencies is informed by the Presentment Clause and the Separation of Powers Clause. *Ante* at 476–77, 70 *A.*3d at 578–79. Citing *Brown,* the majority holds that the Legislature drafted the Reorganization Act so as to limit the Governor to " 'rearranging what already exists,' " and that it does not empower the Governor to "place 'new or different authority . . . in his branch of government.' " *Ante* at 476–77, 70 *A.*3d at 578 (alteration in original) (citing *Brown, supra,* 62 *N.J.* at 10, 297 *A.*2d 572).

I respectfully disagree with the majority's contention that the Presentment Clause and Separation of Powers Clause support its holding in this case. This Court's decision in *Brown* arose from Governor Cahill's Reorganization Plan, referred to above in Part III, which affected the Department of Labor and Industry, in which PERC was situated. *See Brown, supra,* 62 *N.J.* at 4, 297 *A.*2d 572; 4 *N.J.R.* 161(a). Thus, the principles set forth in *Brown* were articulated in the setting of a constitutional challenge to a Reorganization Plan applied to an "in but not of" agency, the Division within which PERC resided. *See Brown, supra,* 62 *N.J.* at 4, 297 *A.*2d 572; *L.* 1968, *c.* 303, §§ 5(a), 6(a); 4 *N.J.R.* 161(a).

The limited legislative grant of reorganization authority to the Governor, which was held to meet constitutional norms in *Brown*, thus included the very power at issue here: the authority to reform "in but not of" agencies. *See Brown, supra*, 62 *N.J.* at 10–11, 297 *A.*2d 572. Accordingly, I cannot agree with the majority that *Brown* provides any support for its holding; on the contrary, *Brown* confirms that the Legislature conferred upon the Governor reorganization powers that reach "in but not of" agencies.

Moreover, I cannot agree that the Legislature would articulate constitutionally-dispositive constraints on the Governor's authority by means of the obscure language relied upon by the majority. If, as the majority concludes, the Legislature excluded "in but not of" agencies to avoid violating *N.J. Const.* art. V, § 1, ¶ 14(a) and *N.J. Const.* art. III, ¶ 1, it would do so in unmistakable terms. The use of the term "of," as used in *N.J.S.A.* 52:14C–3(a)'s definitional phrase, is anything but the clear expression of legislative intent that would be expected if a statute's constitutionality were at stake. I cannot conclude that this single word was chosen by the Legislature because it was concerned about the constitutionality of its enactment. Accordingly, I respectfully disagree with the majority's constitutional analysis.[8]

---

[8] Although it characterizes its holding as exclusively premised upon a construction of *N.J.S.A.* 52:14C-3, the majority substantially relies on federal law. It recites in detail the legislative history of Congress's 1977 and 1984 amendments to the federal Reorganization Act, both of which limited the reach of the federal law. *Ante* at 477, 70 *A.*3d at 578–79 (citing Reorganization Act of 1977, Pub.L. No. 95–17, § 2, 91 *Stat.* 29, 31–32 (1977) (codified at 5 *U.S.C.A.* § 905(a)); Reorganization Act Amendments of 1984, Pub.L. No. 98–614, § 3(a), 98 *Stat.* 3192, 3192 (1984) (codified at 5 *U.S.C.A.* § 906(a)). I respectfully submit that Congress's constraint on the President's power to reorganize federal executive agencies not only fails to support the majority's holding here, but conflicts with that holding. Declining to abrogate executive reorganization authority as Congress has, the New Jersey Legislature has determined not to follow the federal path. This Court in *William H. Goldberg & Co. v. Division of Employment Security*, noting that the New Jersey Legislature declined to amend our unemployment compensation laws in conformance with a change in corresponding federal law, held that "[s]uch a change of language in a statute ordinarily implies a purposeful alteration in the substance of the law since we must assume that

## VI.

I concur with the majority that the Governor and Legislature have stated a common objective: to reform the administration of affordable housing policy in New Jersey. *Ante* at 479, 70 *A.*3d at 580. In my view, the Reorganization Plan struck down today expressed the coordinate branches' shared intent. It was the latest in a four-decade series of initiatives to restructure government, many affecting "in but not of" agencies such as COAH, efficiently achieved pursuant to the Reorganization Act.

For the reasons stated above, I do not share the majority's conclusion that the Legislature intended to exclude "in but not of" agencies from the Reorganization Act. I am not persuaded by the majority's construction of the Legislature's intent, and I find compelling evidence to the contrary. Accordingly, I would uphold Reorganization Plan No. 001–2011, and I respectfully dissent.

*For Affirmance as Modified*—Chief Justice RABNER, Justices LaVECCHIA and ALBIN, and Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned)—5.

*For Dissent*—Justices HOENS and PATTERSON—2.

---

our Legislature acted with knowledge of the existing provisions of the related federal statute." 21 *N.J.* 107, 112–13, 121 *A.*2d 12 (1956) (citing *Nagy v. Ford Motor Co.*, 6 *N.J.* 341, 348, 78 *A.*2d 709 (1951); *Eckert v. N.J. State Highway Dep't*, 1 *N.J.* 474, 479, 64 *A.*2d 221 (1949)).